**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Russell MEANS, Defendant and Appellant.**

**No. 11826.**

Supreme Court of South Dakota.

June 20, 1978.

Rehearing Denied July 26, 1978.

---

**3.** See footnote # 2.

See also 257 N.W.2d 595.

Peter H. Lieberman and Leann Larson Finke, Asst. Attys. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on brief.

Sidney B. Strange, Sioux Falls, for defendant and appellant; Kenneth E. Tilsen and Jacqueline D. Quick, St. Paul, Minn., on brief.

HERTZ, Circuit Judge.

The defendant, after a trial to the court sitting without a jury, was found guilty of the crime of Rioting to Obstruct (SDCL 22-10-4). Defendant appeals from his conviction, claiming a number of errors by the trial court.

The defendant was indicted, and subsequently arrested, as the result of a disturbance involving policemen and Indian spectators, that occurred in the south courtroom on the third floor of the Minnehaha County Courthouse, in Sioux Falls, South Dakota, during the morning of April 30, 1974. The courtroom was at that time being used for the trial of several defendants charged with rioting in Custer, South Dakota, during 1973. (*State v. Bad Heart Bull, et al.*, S.D., 257 N.W.2d 715 (1977)). The Honorable Joseph Bottum, a circuit judge of the Seventh Judicial Circuit Court, was presiding over the trial.

On April 25, 1974, Judge Bottum determined that Ramon Roubideaux, one of three attorneys for the defendant and the only Indian attorney, was in contempt of court. Attorney Robideaux was sentenced to one day in the county jail and fined $100.00. Mr. Roubideaux in fact was jailed; however, the fine was later rescinded.

When court reconvened on April 26, 1974, the courtroom contained a number of spectators apparently sympathetic to Mr. Roubideaux. When Judge Bottum entered the courtroom to commence the trial for that day, these sympathizing spectators refused to rise in response to the bailiff's request to do so. Judge Bottum thereupon ordered the removal of those spectators. The sheriff first advised those present that if they refused to leave the courtroom they would be carried out. The removal was then accomplished by the sheriff and other officers by physically carrying each of the spectators that refused to stand out of the courtroom. There was no violence of any kind connected with this incident on April 26, 1974.

Sometime prior to April 30, 1974, security measures were agreed upon between Judge Bottum and certain law enforcement people. The plan was to go into effect when court reconvened on April 30, 1974, and included such things as limiting the number of spectators to twenty; locking certain exterior doors; requiring passes to gain entrance into the courtroom; and requiring everyone to be pat searched and passed through a metal detector.

On April 29, 1974, several meetings between the Custer Courthouse defendants, their legal staff, and friends and supporters, were held in the Van Brunt Building situated on North Phillips Avenue in downtown Sioux Falls. The purpose of the meeting was to discuss the occurrences of April 26th and to determine the course of action to be followed when court next convened on April 30, 1974. Kenneth Dahl, a witness for the state, testified that he attended the meetings, that the defendant conducted the meetings, and that defendant called for action which would result in a mistrial. Mr. Dahl estimated there were seventy-five to a hundred people present. Mr. Dahl further testified that defendant issued a call for thirteen to fifteen of the toughest warriors to volunteer under the pass system ordered by Judge Bottum. Those that were not chosen, according to Mr. Dahl, were advised that there were other activities planned for outside of the courthouse. Those that did obtain passes were instructed not to stand for Judge Bottum in the courtroom and that the activity outside the courtroom was to begin when a window was broken out of the courtroom. The defendant does not deny that the meetings took place but, through various witnesses, denies Mr. Dahl's version of what was said and done at the meetings. There is also testimony by some of defendant's witnesses that indicates that Mr. Dahl was not even present at the two meetings.

The next morning on April 30, 1974, some twenty potential spectators, including the defendant, were processed through the security system and proceeded to the courtroom and were seated in the first two rows of seats. The defendant was not among those first seated, it appearing that he was still in the jury room, when Judge Bottum

entered the courtroom the first time and the bailiff announced: "The court, please rise."

The spectators occupying the first two rows of seats refused to rise for the judge, whereupon the judge immediately returned to his chambers, and on the way out he ordered the bailiff to clear the courtroom. Very shortly thereafter, and after consultation with Sheriff Hawkey, Judge Bottum issued the following oral order: "It will be the order of the court those who do not stand in this matter will be removed from the courtroom and kept out. The rest of you may sit down. Thank you." This order was made at approximately 9:30 a. m. on April 30, 1974. The record indicates that some fourteen to sixteen people refused to stand for Judge Bottum.

Sheriff Hawkey entered the courtroom and ordered the first two rows of spectators to leave. They silently refused. There is evidence that Celeste Zimmerman, a woman bailiff, and Captain Earl A. Callahan of the Sioux Falls Police Department, also asked the people seated in the first two rows to leave. Captain Callahan testified that he requested the presence of the specially equipped and trained Tactical Squad at approximately 10:20 that morning because he was anticipating trouble from the Indian people.

Captain Callahan testified that he had been advised that certain people outside the courthouse were gathering rocks and other hard substances, and this alerted him to the possibility of a disturbance inside the courtroom.

It appears that the Tactical Squad arrived at the courthouse about 10:50 a. m. that morning. The Tactical Squad was formed up in the hallway outside the courtroom. Prior to the Tactical Squad's entry into the courtroom, some clergymen and the defendant himself conferred with Judge Bottum. The clergymen, in effect, urged Judge Bottum to rescind his order to stand to avert a further confrontation. Judge Bottum refused, but did request the defendant to use his influence in convincing those persons who did not stand to either stand or leave peacefully. It appears defendant did discuss this matter with the Indian people seated in the first two rows. He reminded them of Judge Bottum's order and asked if they intended to stand. The answer was obviously no, and defendant said something to the effect that if that is their decision, he must sit with his people. Defendant thereupon seated himself on the end of the third or fourth row.

It now being quite apparent that the Indian spectators would not stand, nor leave voluntarily, Sheriff Hawkey directed Captain Callahan to remove them bodily from the courtroom. It appears that Captain Callahan in fact ordered the Tactical Squad to remove the spectators, without really limiting the order to those who had refused to stand for Judge Bottum.

In any event, the Tactical Squad did enter the courtroom. From this point on, there is a considerable conflict in the evidence. The one thing everyone agreed on was that moments after the entry of the special unit with riot batons at the ready, "All hell broke loose," "It just exploded."

There is no question but that there was almost immediate physical contact between squad members and Indian people, including the defendant. There is considerable disagreement between the state's version and the defendant's version of just what exactly transpired. Officer Richard Ideker was one of the first to enter the courtroom. According to Officer Ideker and state's witness, Kenneth Dahl, it was the defendant that struck the first blow by hitting Officer Ideker with his fist. According to some of the defendant's witnesses, it was Officer Ideker that was the aggressor and instigator of the attack. A more detailed analysis of the various witnesses' testimony will be alluded to later.

The defendant's appeal raises a number of issues wherein it is claimed the trial court erred, all of which will be here separately addressed under an appropriate heading.

### The Constitutionality of SDCL 22–10–1 and SDCL 22–10–4

Defendant contends that both SDCL 22–10–1 and SDCL 22–10–4 are un-

constitutional because of their failure to expressly require a showing of criminal intent; that the statutes are vague and overbroad and constitute an infringement upon the rights of free assembly and speech.

The constitutionality of SDCL 22–10–1 has just very recently been passed upon by this court in the case of *State v. Bad Heart Bull, et al.*, S.D., 257 N.W.2d 715 (1977). And since the oral argument in this matter, the constitutionality of SDCL 22–10–4 also has been considered in the case of *State v. Kane*, S.D.,266 N.W.2d 552, (1978).

There is no need to encumber this record with selective repetition from those cases. It is sufficient for our purposes to note that the constitutionality of both of these statutes was upheld in all areas complained of by the defendant. We can conceive of no valid reason why we should now recede from such recent pronouncements of this court.

Briefly stated, this court held:

1. The necessary criminal intent to commit the crime of riot may be inferred from all the facts and circumstances surrounding the commission of the offense. And that where criminal intent is an essential element of the crime, but is not made so by express statutory language, it will be implied.

2. The riot statutes give fair notice to a person of ordinary intelligence that certain specific conduct is prohibited, and are therefore not constitutionally infirm by reason of vagueness or overbreadth.

3. That the riot statutes prohibit certain defined conduct, rather than forms of expression, and therefore they do not violate the constitutional rights of free expression and assembly, as those rights end when violence begins.

Defendant further contends that even if SDCL 22–10–4 was held to be constitutional, its application as to him was unconstitutional. The defendant asserts that he was merely exercising his First Amendment rights of petition, free speech and assembly, and that since Judge Bottum's removal order was not expressly directed to him, the governmental action taken to remove him was constitutionally impermissible.

 The defendant does not take issue with the lawfulness of Judge Bottum's order requiring all spectators to stand as he entered the courtroom to commence the trial. Indeed, it should be apparent to everyone that a trial judge has an inherent power, as well as a duty, to conduct a fair and orderly trial.[1] In pursuit of this worthy goal, the court has the authority to issue such proper orders as may be necessary from time to time. The fact that the order to stand was not expressly directed at the defendant is immaterial. It was an order consistent with the inherent power of the court to maintain orderly proceedings in the courtroom. Defendant was totally aware of Judge Bottum's insistence that the spectators stand. He had personally conferred with Judge Bottum concerning this very issue. The evidence is that he reiterated the order to stand to the fourteen to sixteen male Indians seated in the first two rows. He was heard to say, after they refused to be persuaded, "I must sit down with my people." At this very time defendant knew that, if he did not leave peaceably with all of the others, he would be removed forcibly by the authorities present. The participation of the defendant in the ensuing disturbance was at his peril. The action taken by the Tactical Squad moments later was to carry out Judge Bottum's order to clear the courtroom of spectators. This order included the defendant and any other spectators that resisted attempts to restore order in the courtroom. Defendant's claim, therefore, that the action taken against him was constitutionally impermissible, is without merit.

---

1. *United States ex rel. Robson v. Malone*, 412 F.2d 848 (7th Cir. 1969); *Comstock v. United States*, 419 F.2d 1128 (9th Cir. 1969).

What was said in *United States v. Snider*, 502 F.2d 645, 664–665, (4th Cir. 1974) seems quite appropriate here:

Justice is badly served by encouraging a flagrant and deliberate disregard of the lawful order of a judge in his own courtroom. Each person, whether he be litigant, lawyer or spectator, so long as he is in a courtroom, may be required to yield the expression of so much of his beliefs as not to interfere with the administration of justice. It is not possible in this land of ordered liberty for all of the thousand beliefs to be expressed on each occasion. The expression by word or deed of the private convictions of the Sniders, although they may be deeply held, should yield, during the trial, to the imperative need of the community in having an established forum in which controversies between man and man and citizen and sovereign may be decided in a calm, detached, neutral atmosphere.

### The Adequacy of the Information

The defendant next contends that the trial court erred by refusing to dismiss the information on the grounds that it inadequately advised the defendant of the nature of the charges against him.

In this connection, it is well to examine the pertinent statutes with reference to pleadings in criminal matters.

Of first importance is SDCL 23–32–1, which states that: "All technical forms of pleading in criminal actions having been abolished, it is necessary to plead only the commission of the offense by its usually designated name in plain, ordinary language." And SDCL 23–32–5: "The indictment or information must be direct and certain as it regards: (1) The party charged; (2) The offense charged; (3) The name of the thing or person upon or against whom the offense was committed." And SDCL 23–32–4: "It shall not be necessary to set out therein, with particularity, the facts relied upon to constitute the offense charged, . . . ." And SDCL 23–32–12 which provides that: "The indictment or information is sufficient if it can be under-stood therefrom: (6) That the offense charged is designated in such a manner as to enable a person of common understanding to know what is intended."

■ The sufficiency of the information is tested under the rules of "reasonable certainty." Under the rule of "reasonable certainty," an information must apprise the defendant with reasonable certainty of the accusation against him, so that he may prepare his defense and plead the judgment as a bar to a subsequent prosecution for the same offense. *State v. Sinnott*, 72 S.D. 100, 30 N.W.2d 455 (1948); *State v. Blue Fox Bar, Inc.*, 80 S.D. 565, 128 N.W.2d 561 (1964).

■ The instant information specifies: (1) the name of the defendant charged; (2) when the offense was perpetrated (April 30, 1974); (3) where the offense was perpetrated (in a courtroom at the Minnehaha County Courthouse in Sioux Falls, South Dakota); (4) how it was committed—by three or more persons assembled, by the use of force and without lawful authority; and (5) the purpose of the riotous assembly—to obstruct public officers (Tactical Squad members) by refusing to exit peaceably after having been advised to do so by order of Judge Bottum, on at least three prior occasions.

From all this, there appears to be no way in which the defendant could have been misled concerning the nature of the accusation against him. And certainly under this information a claim of prior jeopardy would be a complete defense for any subsequent prosecution under the same statute.

### The Request for Daily Transcripts and Funds for Attitudinal Survey

The defendant urges that the trial court erred by denying his motions for daily transcripts and for funds to conduct an attitudinal survey, thus denying defendant equal protection of the law.

While it is true that an indigent defendant, in order to put forth an adequate defense, must not only be assured of sufficient governmental funds with which to pay

his court-appointed counsel, but also sufficient funds to provide for the "necessary costs and expenses incident to the proceedings . . . ." (SDCL 23–2–2), the issue here is whether or not the daily transcripts and attitudinal survey were necessary to provide defendant with the defense he was entitled to.

Defendant frankly admits that the granting of this type of assistance to a defendant in a criminal action is in the sound discretion of the trial court. Therefore, in order to gain the point, defendant must demonstrate from the record that the trial court abused its discretion in denying the assistance requested.[2]

The record in this case indicates that defendant was represented by at least three very competent attorneys and that para-legal assistance in the sum of $3,000.00 was expressly authorized by order of the court. It would seem that there was ample manpower available to the defendant for the taking down of pertinent testimony each day. Beyond this, the defendant failed on the record to make a factual showing that his defense was prejudiced by the trial court's failure to grant his motions.

So far as this court has been able to determine, there is no constitutional requirement for the granting of daily transcripts or pretrial attitudinal survey to an indigent defendant. See *Walle v. Sigler*, 456 F.2d 1153 (8th Cir. 1972).

■ The indigent criminal defendant is not entitled to the best defense money can buy; he is only entitled to a competent and meaningful defense. This court believes that the defendant received such a defense in this case and that the trial court did not abuse its discretion in denying the daily transcripts and funds for the attitudinal survey.

### Pretrial Publicity

■ The defendant vigorously urges this court that the trial court erred when it denied his several pretrial and voir dire dismissal motions based on massive pretrial publicity and failed to give the defendant the benefit of the doctrine of stare decisis.

There is no dispute over defendant's claim that the incident that occurred on April 30, 1974, outside and inside of the Minnehaha County Courthouse was highly publicized. There was extensive television coverage of the outside activity, as well as radio and newspaper coverage on both outside and inside events.

The defendant is a bold and articulate spokesman on behalf of the American Indian Movement (AIM). It was therefore not unusual for the media people to seek him out and press him for comments concerning the occurrences then unfolding in the Sioux Falls community. It is apparent that defendant succumbed to such pressures at least twice by calling press conferences, the first one less than a month before the trial, and the second one during voir dire.

The defendant claims that because of the considerable publicity prior to trial, it should be assumed without further proof that the prospective jurors from Minnehaha County were in fact prejudiced. In other words, the defendant is urging this court to adopt what is referred to in some jurisdictions as the "inherent prejudice" theory. *Pamplin v. Mason*, 364 F.2d 1 (5th Cir. 1966). *United States v. Denno*, 313 F.2d 364 (2nd Cir. 1963). Courts holding this view have declared that evidence of pervasive community bias and prejudice is sufficient for reversal, even without the showing of a clear nexus between community feeling and jury feeling.

This court rejects the "inherent prejudice" theory and instead reaffirms what by statute is required, namely, that a clear nexus between community feeling and jury feeling must be shown in order to justify reversal of the case.

SDCL 23–43–31(2) requires the disqualification of a challenged juror only where there is:

(2) Existence of a state of mind on the part of the juror, in reference to the case or to either party, which satis-

2. *State v. Geelan*, 80 S.D. 135, 120 N.W.2d 533 (1963).

fies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, and which is known as *actual bias.* (Emphasis supplied)

SDCL 23–43–32 lists some ten situations where bias may be implied. Nowhere in either of these two sections is community bias a ground for challenge to the entire panel of prospective jurors.

It is apparent from research that a substantial majority of jurisdictions hold to the view that community bias or prejudice by itself is insufficient to negate the trial, but that community prejudice must be translated into jury prejudice.[3] We believe this to be the fairer and sounder rule. We prefer to adopt the view of the California courts, which have had considerable experience in publicized crimes and trials, such as the Tate-LaBianca murders. In *People v. Manson*, 61 Cal.App.3d 102, 132 Cal.Rptr. 265, 319 (1976), despite the massive state and national pretrial publicity, the court there pointedly observed:

The fact that a case receives enormous publicity does not by itself establish error nor does conceded 'massive' publicity automatically translate into prejudice. Here the court issued silence orders, conducted a controlled and searching voir dire, properly admonished the jury and implemented court procedures to afford appellants a dignified and restrained trial atmosphere. In addition, . . . The jurors, . . . were sequestered for the entire guilt phase of the trial.

\* \* \* \* \* \*

To reverse convictions because [of the possibility that some residual prejudice remains] would effectively immunize some defendants in highly sensational cases. (Citations omitted.) Exposure to publicity alone does not make it impossible for jurors to perform their obligation.

It is a general rule that dismissal of a criminal charged on the grounds urged here should be ordered only after a conclusive showing that a fair and impartial jury cannot be empanelled.[4] We are of the opinion that the record before us does not support defendant's claim of error under this heading.

On May 5, 1975, somewhat more than three months before the jury selection began in this case (August 25, 1975), the Honorable Richard Braithwaite, a judge of the Second Judicial Circuit Court in and for Minnehaha County, South Dakota, dismissed the prosecutions in the cases of the *State v. Waubun Nuwi Nini, John Concannon, Al Cooper, Bobbi Jo Tiger and Lois Tiger* for the reason and upon the grounds that a fair and impartial jury could not be obtained in Minnehaha County.

Defendant contends that under the doctrine of stare decisis, he also was entitled to a dismissal of the charges against him since, he claims, the publicity in his case was no less pervasive than in *Waubun Nuwi Nini's.* We disagree. The doctrine of stare decisis is not applicable. In *Printup v. Kenner*, 43 S.D. 473, 476, 180 N.W. 512, 513 (1920), this court stated that " 'Stare decisis is a name given to a doctrine that, when the court has laid down a principle of law as applicable to a certain state of facts, it will adhere to that principle, and apply it to all further cases where *the facts are substantially the same.*' " (emphasis supplied)

Stare decisis deals only with principles of law. The only principle applicable in this case is the right to a fair and impartial jury. The trial judge did not abandon that principle or fly in the face of it. He merely determined that under the fact situation existent at the time of the voir dire examination in the second case, a fair and impartial jury could be selected as opposed to the situation some three months earlier during the voir dire examination in the

3. *United States v. Banks*, 374 F.Supp. 321, 323 (D.S.D.1974); *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975); *People v. Manson*, 61 Cal. App.3d 102, 132 Cal.Rptr. 265, 319 (1976).

4. *United States v. Banks, supra; Calley v. Callaway, supra; People v. Manson, supra.*

*Waubun Nuwi Nini* case. The fact that two acquittals in similar cases[5] had occurred in the interim is ample support for the trial court's finding.

### Defendant's Challenges of Jurors Byrd, Kittams, Doggett, Lamb, Moe and Brandon

Defendant here contends that the trial court erred by denying his challenges for cause directed at the above-named jurors, thereby denying him a fair and impartial jury and requiring him to give up his right to a jury.

Defendant is not saying here that because the challenges were denied he did not get a fair trial before the trial judge presiding without a jury. He is obviously claiming that because the challenges were denied, and he did not have enough peremptory challenges remaining (defendant had used up eight), he could not hope to obtain a fair and impartial jury to hear his case, thereby causing him to give up his right to a jury trial.

The important issue here is whether the trial judge acted properly, and within the limits of his discretion, in the denial of these six challenges.

A thorough study of the voir dire examination reveals that all of these jurors were extensively questioned concerning their qualifications to sit as a juror in defendant's case, particularly by counsel for defendant, as well as by the state and the trial judge. While all of the jurors admitted to exposure to much of the publicity attendant with the incident, all declared that they would set aside such things and would judge the defendant's innocence or guilt only on the evidence and the instructions of the court.

The case of *State v. Flack*, 77 S.D. 176, 181, 89 N.W.2d 30, 32 (1958) is dispositive of defendant's claim of error here. This court there said:

In denying the challenges the trial court determined the questioned jurors could and would, notwithstanding their opinions, act fairly and impartially. This finding was made on conflicting evidence indicating both disqualification and competency to act as jurors. In each case the trial court's conclusion was based on a consideration of the entire voir dire examination and also upon the intangible manifestations of impartiality reflected by the juror's appearance, conduct, and demeanor in the courtroom.

We cannot try a challenge de novo on the record alone. Our review is limited to a question of law. The ruling of the trial court will not be disturbed, except in the absence of any evidence to support it, in which case it becomes an error at law. 'When the evidence of each juror is contradictory in itself, and is subject to more than one construction, a finding by the trial court either way upon the challenge is conclusive on appeal.' 4 Cal.Jur.2d, § 603, p. 483. In the present case the evidence of each challenged juror was contradictory and subject to more than one construction. The rulings of the trial court on such conflicting evidence are, therefore, binding on this court.

It is important to note here that it is the trial judge's function to determine the existence of the juror's "state of mind." This, necessarily, is a fact finding function and, as *State v. Flack*, supra, indicates, the court is vested with "broad discretion." If there is evidence to support the trial court's ruling on the challenge for cause this court should not disturb that ruling. Only where there is no evidence to support the trial court's ruling can this court interfere. It is stated at 47 Am.Jur.2d, Jury, § 221:

[W]hen a full examination of a juror leaves the question of his competency doubtful, the appellate courts generally leave the ruling of the trial court undisturbed.

5. The finding of jury bias in *Waubun Nuwi Nini* was undone by the successful trial, (after the dismissal) of the cases entitled *State of South Dakota v. Edgar Bear Runner*, C.R. 74–99, and *State of south Dakota v. Russell Means*, C.R. 74–111, both of which resulted in not guilty verdicts.

■ Having been denied the six challenges for cause, and with only two peremptory challenges remaining, defendant made a decision to waive the jury. In doing so, he executed the following document:

I, Russell Means, have been informed of my constitutional right to a trial by a fair and impartial jury. This is a knowledgeable waiver which is freely and voluntarily executed; no promises nor threats have been made to me; and I am under no pressure from any individual to execute this waiver. As co-counsel in this case, I believe it is impossible for me to obtain a fair and impartial adjudication by jury in this action.

By waiving his right to a jury trial prior to the exhaustion of all of his peremptory challenges, the defendant has waived his objection to the challenged jurors. *State v. Belt*, 79 S.D. 324, 111 N.W.2d 588 (1961); *State v. Flack*, supra.

■ The evidence here supports the trial court's ruling on the six challenges for cause, and therefore that ruling may not be disturbed.

### The Resignation and Discharge of Sidney Strange

The defendant claims error by the trial court when Sidney Strange, one of defendant's attorneys, was refused permission to resign and defendant was denied permission to discharge him, based on Mr. Strange's determination that he had a conflict of interest due to the addition of Kenneth Dahl as a state's witness. The defendant asserts that the court's refusal to permit Mr. Strange's resignation, or in the alternative to permit defendant to discharge him, constituted a denial of the effective assistance of counsel in violation of the Sixth Amendment to the Constitution.

One day before the trial was to begin, the state moved for permission to add Kenneth Dahl as a prosecution witness. This motion was granted over defendant's strong objection. Immediately thereafter, Mr. Strange moved to be relieved as counsel for the defendant due to a prior attorney-client relationship that had existed between him and Mr. Dahl. Mr. Strange concluded that he could not effectively cross-examine Mr. Dahl due to the existence of privilege and further advised the court that it was quite possible that he could be called to testify in rebuttal to Mr. Dahl's testimony. The court denied this motion. Defendant then attempted to summarily discharge Mr. Strange, contending Mr. Strange would quite possibly become a defense witness. This request was also denied by the trial court.

It appears that Mr. Strange was appointed to prosecute an appeal for Mr. Dahl in August of 1974. Mr. Strange continued to represent Mr. Dahl in his appeal until either December of 1974 or January of 1975, at which time Mr. Dahl discharged him. It is therefore apparent that the attorney-client relationship was fully terminated prior to Mr. Strange's appointment to serve as defendant's counsel in the instant case.

On October 27, 1975, the trial judge conducted a thorough examination of Mr. Dahl concerning his apparent intention to waive the attorney-client privilege between himself and Mr. Strange. The examination extends through some fifty-seven pages, and at the close of such examination the court declared the waiver effectuated and the trial to the court began on November 3, 1975.

■ The fact that an attorney once represented a client who subsequently becomes a witness in another trial does not automatically give rise to a per se conflict of interest, nor a Sixth Amendment violation. *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), *cert. denied* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656. Further, once Mr. Dahl had waived the attorney-client privilege it was no longer possible for Mr. Strange to assert it. The right of privilege is personal to the client, and after an effectual waiver the privilege disappears and the barrier is removed.[6]

6. *Olshen v. McMann*, 378 F.2d 993 (2nd Cir. 1967), *cert. denied* 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157; McCormick, Evidence (2nd Ed. 1972) § 92, p. 192.

In the final analysis, it is for the trial court to examine all of the circumstances in order to determine whether counsel's undivided loyalties reside with his current client. *United States v. Jeffers,* supra. In reviewing defendant's claim here, it is necessary to refer back to the written record. In doing so, it is plain to see that Mr. Strange left no stone unturned in his cross-examination of Mr. Dahl. Mr. Strange was obviously benefitted by the information he had received from Mr. Dahl while representing him, since the cross-examination conducted by him can be characterized only as a "searching, vigorous and completely comprehensive" examination. It is said that any inference of prejudice to an appellant is forcefully mitigated by the attorney's vigorous cross-examination of his former client, and his exhaustive attack on the former client's credibility. *Olshen v. McMann,* 378 F.2d 993 (2nd Cir. 1967), *cert. denied* 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157. We find that such was the case here and that defendant suffered no prejudice under the court's ruling. We hold that some specific instance of prejudice, some real conflict of interest resulting from the dual representation, must be shown before it can be said effective assistance of counsel was denied.[7]

Defendant, however, further claims that his case was prejudiced because the trial court failed to allow Mr. Strange to resign or be fired by defendant so that Mr. Strange could be called as a witness for the defendant in order to rebut or impeach Mr. Dahl's testimony.

The difficulty here is that other than defendant's bald conclusory statement he was prejudiced, there is nothing in this record to support such a claim. To obtain relief in this court the defendant must surely present facts upon which it might be concluded that his case was prejudiced, as he claims. Defendant, both in his brief and on oral argument, asserts that this claim

must be accepted on its face in view of the fact that the trial court refused to permit him to elaborate on this claim. We are of the opinion, however, that having been rebuffed by the court, defendant was obliged to make an offer of proof. Even though the trial judge stated that he did not want to hear Mr. Strange's statement as to the content of possible rebuttal testimony, defendant could not have been prevented by the trial court from making an offer to prove exactly what that testimony would be. Had Mr. Strange done so, this court would now be in a position to properly evaluate his claim of error under this heading. As the record presently stands, this court has nothing on which it can fairly determine the issue of prejudice claimed by the defendant. We therefore hold that by failing to make such an offer of proof defendant failed to properly preserve his record on this appeal.[8]

### Admission of Exhibit # 47: Video Tape of Outside Disturbance

The defendant contends that the trial court erred by admitting into evidence Exhibit # 47, which was a video tape of the "outside disturbance," for the reason and upon the ground that it had no probative value and was bound to have a substantial prejudicial effect upon the trial judge also sitting as the fact finder.

It is conceded by the defendant that the admission of this kind of evidence is within the sound discretion of the court. Accordingly, it follows that in absence of a showing of abuse of discretion, the ruling must remain undisturbed.

There is testimony, both by state and defense witnesses, that at a meeting at the Van Brunt Building on the evening of April 29, 1974, some activity was planned for those situated outside the courthouse. There was testimony from Mr. Dahl that the activity would commence when a win-

7. *U. S. v. Jeffers,* 520 F.2d 1256 (7th Cir. 1975), *cert. denied* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656.

8. *State v. Luna,* S. D., 264 N.W.2d 485 (1978); *State v. Murray,* 49 S.D. 429, 207 N.W.2d 454 (1926).

dow in the courtroom was broken. In other words, the state was claiming that there was a clear connection between what transpired in the courtroom and the outside activity and, further, that the defendant was privy to this information.

Considered under these circumstances, the video tape was both relevant and admissible. The video tape was proof that a riot outside the courthouse actually occurred. This goes directly to the credibility of Mr. Dahl's testimony regarding plans for the "outside" as well as the "inside" disturbances, all of which information he claimed to have obtained while attending the meeting at the Van Brunt Building on the evening of April 29, 1974. Further, some of defendant's witnesses testified that no violence was planned, and the video tape tended to impeach such testimony.

Beyond all that, this court ought not hesitate to pointedly observe that the trial judge was also sitting as the fact finder in this case. By his training and his considerable trial experience, he was exceptionally and expertly qualified to judge the relevancy of such evidence without being swayed or "prejudiced" by the activity portrayed. We find no error here.

### Discovery

■ Defendant contends the trial court erred when it required that his attorney's work product be furnished to the prosecution.

Again it is conceded that the extent of discovery permitted by either side rests in the discretion of the court. *State v. Wade*, 83 S.D. 337, 159 N.W.2d 396 (1968). We find no abuse of that discretion here.

The trial judge's order directed delivery of signed or recorded statements of defense witnesses, and specifically excluded work product. Defendant has the burden of showing just how he was prejudiced in his defense by the court's order on discovery. There is no such satisfactory showing in this record.

### Insufficiency of the Evidence

The defendant vigorously urges that the state failed to introduce sufficient evidence to sustain the court's finding that defendant violated SDCL 22–10–4.

■ At the very outset of this discussion, we are reminded that this court accepts that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict. *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101 (1965), *cert. denied* 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76.

There is no need here to again set down what was first written concerning the events that transpired from the evening of April 29, 1974, through the morning of April 30, 1974. It is sufficient to confine our discussion to the pertinent facts surrounding the defendant and his participation or nonparticipation in the activities that unfolded on that day.

There is no dispute that defendant was actually present in the courtroom when the Tactical Squad entered to carry out Judge Bottum's order, to-wit:

"It will be the order of the court those who do not stand in this matter will be removed from the courtroom and kept out. The rest of you may sit down."

Defendant insists that this order did not include him since he was not in the courtroom when it was ordered cleared. While it is true that defendant was not present when Judge Bottum first issued the order, it would strain the imagination if one were to conclude, as defendant apparently does, that this would permit activity on his part which would directly affect the trial and the decorum of the court. It is further inconceivable that the defendant was unaware of Judge Bottum's order, in light of the fact he personally conferred with Judge Bottum on this very point. He was personally requested by the court to use his good offices to persuade the recalcitrant spectators to either stand or peaceably leave the courtroom. The defendant in fact discussed this very matter with these same spectators. They continued to refuse to obey the order of the court, and defendant then chose to sit down with them.

All parties agree that the assembly was peaceful at all times prior to the entry of the Tactical Squad. And there is no disagreement over the fact that the seating of the fourteen to sixteen male Indians in the first two rows was entirely lawful and proper. However, there is outright disagreement over what happened after the Tactical Squad entered the courtroom.

The testimony of the state's witnesses discloses the following:

Officer Richard Ideker was one of the first of the Tactical Squad members to enter the courtroom. He testified that Captain Callahan instructed the squad to clear the courtroom and to use as little force as was necessary. All of the members were in full uniform and carrying a riot baton in a "port arms" position. Officers Kisecker and Sorenson stopped to talk to David Hill, one of the defendants on trial. Officer Ideker proceeded on towards the east wall, noticing that all of the fourteen to sixteen Indians were now standing. He came upon the defendant standing in the aisle with his arms folded. There was still quiet in the courtroom at this time. Officer Ideker testified that he then approached defendant, continuing to carry his riot baton in a port arms position. He stated that he went as close as he could to the east wall and tried to edge by the defendant. He was unable to get by, claiming that defendant hit him in the chest with his left fist. Defendant then grabbed Officer Ideker while another individual struck him. Officer Ideker tried to raise the baton in order to push defendant away, but was unable to do so. Defendant was then alleged to have said, "The stick, get the stick." The baton was in fact removed from Officer Ideker's grasp, and as he was losing control of it, Officer Ideker struck defendant in the face. After that there were further blows from an unidentified assailant, and Officer Ideker fell to the floor. It was during this time that Officer Ideker also became aware of fighting going on between other Indians and Tactical Squad members.

Mr. Kenneth Dahl was the only other state's witness to corroborate Officer Ideker's testimony as to who struck the initial blow that preceded the melee that followed. Mr. Dahl testified as follows:

Q What did you see?
A I seen Russell Means hit a guy, hit a Tac Squad member.
Q Where did this occur?
A Right next to the window.

\* \* \* \* \* \*

Q Did you at anytime see that Tactical Squad member do anything to Mr. Means prior to the time Mr. Means struck him?
A No, I didn't.
Q Did you see any kind of commotion or any confrontation in that courtroom prior to the time you saw this Tactical Squad member strike Mr. Means —or, excuse me—Mr. Means strike this Tactical Squad member?
A No, I didn't.

\* \* \* \* \* \*

Q What was happening in the rest of the courtroom?
A It just exploded.
Q When did it explode?
A When Mr. Means hit the Tactical Squad member.

The defendant relies specially on the testimony of several clergymen and attorneys who testified in support of defendant's claim that the evidence for conviction was insufficient as a matter of law and that the court erred in not so ruling.

Perhaps the most detailed and direct testimony in this regard came from the Reverend William Weber, an ordained minister of the Lutheran Church, Missouri Synod.

He testified that he and four bishops of the American Lutheran Church and other clergymen were at this very time engaged in Indian related conferences in the city of Sioux Falls, South Dakota; that at about 2:30 on the morning of April 30, 1974, he received a call from Vernon Bellecourt. Reverend Weber had previously become acquainted with Mr. Bellecourt because of his work on Indian concerns. Mr. Bellecourt stated that he was fearful of what would

happen if the Indian spectators refused to stand for Judge Bottum that morning, just as they had refused to do on April 26, 1974, and that he (Mr. Bellecourt) was concerned that forced removal could lead to violence. Mr. Bellecourt requested that Reverend Weber and the bishops attend the court as observers. Reverend Weber carried this message to the bishops and others gathered for the conference, and it was unanimously decided to present themselves in the courtroom that day. None of them had passes, but were admitted into the courtroom without them. Reverend Weber stated that he took a seat in the fourth or fifth row and that the first two rows in that section were occupied by thirteen Indians (he having actually counted them). From this point on, up to the Ideker-Means confrontation, Reverend Weber agrees with other witnesses concerning Judge Bottum's order, the bishops' and defendant's conference with the judge, the defendant's explanation of the judge's order, and the fact that several people, including Sheriff Hawkey, Officer Callahan and two bailiffs, had asked the Indian spectators to stand or leave peaceably. He observed defendant sitting with his people.

According to Reverend Weber, the Tactical Squad entered at a fast walk with their batons held forward. He noticed that defendant came to a standing position immediately upon the entry of the Tac Squad members. One of the first officers to enter proceeded directly towards defendant with "the night stick held in both hands and outstretched." The officer attempted to lodge the baton under defendant's chin and push him back. Defendant resisted and "came around with his left arm and hit the policeman on the side of the helmet."

Q Who made the first contact, Reverend Weber?

A The policeman.

* * * * * *

Q And at some point did you see a chair thrown at a window?

A One of the Indian spectators, when he entered the jury box, raised a chair with casters on it, and an armchair,

over his head and moved across the room to where Russell Means was struggling with the officer. And at first I thought he was going to hit the officer with the chair, and then it appeared as though he thought better of that and smashed the chair through the window, through the plate glass window.

Q And how long was this after the initial contact was made with Russell Means by the first Tactical Squad members?

A It was probably a matter of seconds

. . ..

Of the four American Lutheran bishops present and standing behind the bench when the Tactical Squad entered, only two, Bishop Bruno Schlachtenhaufen and Bishop Archie Madsen, were called upon to testify for the defense.

With respect to the confrontation between Officer Ideker and the defendant, Bishop Schlachtenhaufen testified:

Q Did you see them make contact with any individual near the windows?

A Well, the first one I saw there was Russell Means. He had been sitting at the end and as they came towards him, then there was contact.

Q Would you describe how those Tac Team members approached Russell Means?

A They came marching at that same— at that same pace with their clubs being held as I described.

* * * * * *

And it would be difficult to say who made contact first because at that point things simply exploded. But there was certainly contact made and then there was an attempt to defend himself. And at that point all of them in those two pews, whoever was there, began to attack and defend themselves as they were being attacked.

* * * * * *

Q Did you see Russell Means make contact with any Tactical Team member?

A Yes. I saw him grab the baton of those first ones and try to get it out of his face.

Bishop Archie Madsen testified:

Q What happened when the Tac Squad people reached Mr. Means?

A He put up his hands and grabbed one of these batons also, out in front of himself, in this way.

Q Was the person holding the baton moving towards Mr. Means at that time?

A Yes. That was the direction of the activity.

\*　　\*　　\*　　\*　　\*　　\*

Q Did you see Mr. Means punch any member of the Tac Squad that morning?

A No, I did not.

Attorneys Jack Pratt and Ramon Roubideaux were also present in the courtroom the morning of April 30, 1974. While the defendant argues, both in his brief and at oral argument, that their testimony supports the view that defendant was never the aggressor, a careful examination of their testimony does not support this claimed corroboration. There is nothing in Mr. Roubideaux's testimony that touches on the confrontation between Officer Ideker and the defendant. The most that can be said is that "they (Tac Squad) came in swinging those batons." This remark was confined to the Indian spectators in general. So, likewise, is the testimony of Attorney Jack Pratt. He, as did Mr. Roubideaux, also testified of an attack on the defendant David Hill, but nowhere is there any testimony corroborating defendant's version of the attack on him by Officer Ideker. Mr. Pratt simply stated that shortly after the Tactical Squad entered, "All hell broke loose. It was just a melee."

Without further belaboring this record, it is enough to say that there are, indeed, conflicting versions of what actually took place after the Tactical Squad entered the courtroom on the morning of April 30, 1974.

The question here is whether or not the state proved up a prima facie case against the defendant, presenting a factual issue to be ultimately resolved by the fact finder, in this case the trial judge himself.

We believe the record supports the trial judge's decision to deny defendant's motion for dismissal on the ground that the evidence was insufficient as a matter of law. On this record, the issue of the guilt or innocence of the defendant was clearly a factual issue to be determined by the court.

It must be remembered that as the ultimate fact finder in this case, the trial court necessarily determined the credibility of each of the witnesses that testified. That the trial court did not believe all of the state's witnesses is evidenced by the fact that the information charging the defendant with willfully injuring a public building was dismissed on a finding of not guilty as to said charge by the same trial court.

 The mere fact that there is a serious conflict in the evidence does not militate against a finding of guilt of the defendant of the offense charged. In the end, the trial judge, as the ultimate fact finder in this case, was required to determine which witnesses were to be believed and which, of all of the evidence that was presented, was the most credible.[9]

 A complete and detailed review of the trial record supports the conclusion that there was sufficient evidence in this case to warrant the trial judge, sitting without a jury, in finding that there was a preconceived plan, originating at the meeting on the evening of April 29, 1974, at the Van Brunt Building, to disrupt the court proceedings then pending before Judge Bottum, and that the defendant was fully aware of all facets of the plan and was a party to it. We, therefore, perceive no reason to disturb the trial court's ruling in this regard.

The following statement, quoted in *State v. Bad Heart Bull, supra, is pertinent here:*

**9.** *Hilde v. Flood,* 81 S.D. 25, 130 N.W.2d 100 (1964); *Durr v. Hardesty,* 76 S.D. 232, 76 N.W.2d 393 (1956).

Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place * * * and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations. *Cox v. Louisiana*, 379 U.S. 559, at 574, 85 S.Ct. 476, at 485, 13 L.Ed.2d 487, at 498.

### The Fifth Amendment Right

Defendant contends the trial court erred by granting the prosecution's motion to advise defense witnesses of their Fifth Amendment right.

 This claimed error would be more forceful had this matter been tried to a jury, but this, of course, was not the situation here. The implication that the trial court, sitting as a fact finder, may have disbelieved a witness that he gave the warning to, unduly discredits the special expertise of the trial judge to disregard and to detach himself from extraneous matters having nothing at all to do with the credibility of a witness before him. Beyond that, the court, if not having a clear duty to advise a witness under SDCL 19–2–8, has discretion on its own motion to advise a witness prior to what the court believes may be incriminating testimony. We find no error here.

### The Failure of the Trial Court to File Findings of Fact and Conclusions of Law

 Defendant urges that the trial court erred by failing to execute findings of fact and conclusions of law as is required in civil court trials (SDCL 15–6–52(a)).

It appears that the only state presently requiring the entry of written findings of fact in a criminal case is the state of Michigan. *People v. Jackson*, 391 Mich. 323, 217 N.W.2d 22 (1974).

It is otherwise universally held that a finding of guilt by a judge, sitting without a jury, necessarily includes a finding that the state has proved each material element of the crime beyond a reasonable doubt. *State v. McJunkin*, 27 Or.App. 401, 556 P.2d 164 (1976).

It is interesting to note that the Federal Rules of Criminal Procedure do not require findings unless there is a specific request to the court. See Fed.R.Crim.P. 23(c).

In this case, the defendant neither filed his own findings nor did he request that findings be entered by the court. It would therefore appear that he is now precluded from asserting the lack of findings as error before this court.

### Defendant's Motion for Modification of Sentence

 Defendant claims error by the trial court by its refusal to consider defendant's motion for modification of sentence.

SDCL 23–57–8 provides:

All courts and the judges thereof having power to suspend sentence under § 23–57–5, and the power to parole first offenders under § 23–57–1, shall have and retain jurisdiction for the purpose of suspending any such sentence or granting any such parole for a period of one year from the effective date of the judgment of conviction, notwithstanding the fact that the time within which an appeal from such judgment may be taken shall be limited to a shorter period of time.

The trial court entered its judgment and sentence on December 31, 1975. On December 30, 1976, defendant filed an application for modification of his sentence pursuant to SDCL 23–57–5 and SDCL 23–57–8. The trial court, without taking any evidence, denied defendant's application on the grounds that the application was not heard

within one year of the effective date of the sentence. In other words, it was the trial court's view that this application must be filed with the court sufficiently in advance of the end of the one-year period set out in the statute that it may be heard prior to the expiration of that period.

It would appear that the plain wording of SDCL 23–57–8 is dispositive of defendant's claim here. The statute directs that: "All courts . . . *shall* have and retain jurisdiction for the purpose of suspending any such sentence or granting any such parole for a period of *one year* from the effective date of the judgment of conviction, . .." (emphasis added) The plain legislative intent expressed here is that a defendant is bound to make his application within a time frame that will permit the court to rule on the application sometime within the period of one year from the judgment of conviction. The defendant having failed to comply, there is no error here.

### *Dismissal—No Saving Legislation*

■ Finally, defendant urges that the information against him be dismissed because SDCL 22–10–4 has been repealed without benefit of sufficient saving legislation.

It is undisputed that defendant had been tried and judgment entered sometime prior to the adoption of the criminal code revision.

As to this case, SDCL 2–14–18 operates to save the prosecution here at issue:

> The repeal of any statute by the Legislature shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

In *United States v. Reisinger*, 128 U.S. 398, 9 S.Ct. 99, 32 L.Ed. 480 (1888), the United States Supreme Court, in interpreting language precisely the same as that found in SDCL 2–14–18, held the criminal

prosecution was preserved, even though the repealing act itself contained no express provision of the right to punish violations of it.

It follows from all of the foregoing, that the conviction of the defendant is affirmed.

All the Justices concur.

HERTZ, Circuit Judge, sitting for ZASTROW, J., disqualified.