STATE of South Dakota, Plaintiff
and Respondent,

v.

Sarah BAD HEART BULL and Robert
High Eagle, Defendants and
Appellants.

Nos. 11531, 11573.

Supreme Court of South Dakota.

Sept. 16, 1977.

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Sidney B. Strange, Sioux Falls, for defendants and appellants.

HANSON, Justice.*

Defendants appeal from their convictions of the crime of riot where arson was committed.

It appears the riot involved relates back to a brawl outside a bar in Buffalo Gap, South Dakota, on January 21, 1973. During the brawl, Wesley Bad Heart Bull, one of defendant's sons, was stabbed to death by Darrell Schmitz, a white man. The state's attorney of Custer County charged Schmitz with the crime of second degree manslaughter. Several members of the Indian community, including Sarah Bad Heart Bull, thought Schmitz should have been charged with murder. This incident apparently became a "cause celebre" of the American Indian Movement which called for a national Indian Civil Rights Day to be held in Custer, South Dakota, on February 6, 1973.

During the morning of February 6 Sarah Bad Heart Bull and Robert High Eagle left their homes in Hot Springs and drove to Custer. They took along Trina Bad Heart Bull, Eddy Clifford and Francis Means. All had been in Buffalo Gap the night Wesley Bad Heart Bull was stabbed and killed. The ostensible purpose of the trip was to give statements to the Custer County State's Attorney or to attend the Schmitz preliminary hearing.

The Custer County authorities had postponed the Schmitz preliminary hearing knowing that a caravan of American Indian Movement members would arrive in Custer on February 6. In anticipation, some security measures had been put into effect. It was arranged that the state's attorney would be present in the clerk of courts' office to meet with anyone wishing to protest his handling of the *Schmitz* case. However, no more than four or five persons were to be admitted into the courthouse for this purpose at one time. Guards were stationed at all exterior doors of the courthouse to screen all persons seeking admission. Different law enforcement officers, such as the State Highway Motor Patrol, were alerted to stand by in the event of trouble.

The defendants arrived at the Custer County Courthouse at approximately 10:00 in the morning. High Eagle was admitted into the courthouse and conferred with the state's attorney. Mrs. Bad Heart Bull made no attempt to gain admission. After

* In accordance with SDCL 16–15.

High Eagle concluded his conference with the state's attorney the Hot Springs group "waited around" outside the courthouse. While waiting they consumed some intoxicating liquors.

The AIM caravan consisting of twenty-five to thirty cars arrived at the Custer County Courthouse at 2:00 in the afternoon. On arrival one member of the group was observed taking a high-powered rifle out of one of the cars. As soon as all of the caravan cars were parked a crowd gathered at the front steps of the courthouse. Four members of the group, Russell Means, Dennis Banks, Crow Dog and David Hill were chosen by the group to confer with the state's attorney.

While the four AIM representatives were inside conferring with the state's attorney the crowd moved up the steps of the courthouse. Many of the demonstrators were carrying concealed weapons such as clubs, sticks, iron pipes, wrenches, and at least one revolver. The officers at the front door resisted but were soon beaten back. About twenty demonstrators, including High Eagle, gained entrance to the front hallway. At the time, High Eagle was armed with a club which he was swinging at the officers. After a brief violent struggle the officers were able to clear the demonstrators out of the courthouse.

As the officers were attempting to clear the demonstrators off the front steps they were confronted with Mrs. Bad Heart Bull who was in the front ranks of the crowd yelling obscenities at them. When she started to grab patrolmen by their jackets she was taken into custody but was soon after released or she escaped.

During this same period one of the police officers was dragged down the courthouse steps and beaten. When Lt. Schmoll went to his rescue he was met with a great deal of violent opposition. Rocks, cans and bottles were thrown at him. As he tried to return with the injured officer he was struck in the face with a flagstaff. He also received a knife wound on his left hand and was struck with a chain saw blade. The final blow he received was delivered by High Eagle who struck him across the head with an iron pipe. This caused the Lieutenant to "fall like a sack of wheat." Thirteen stitches were required to sew up the wound on his head. During the affray several other officers were severely beaten, or injured, and had to be taken to the hospital for treatment. Shortly after High Eagle struck Lt. Schmoll he was arrested and taken into custody. At the time the rioting and violence was in full force but no fires had yet been started.

Throughout the course of the riot Mrs. Bad Heart Bull continued to be an active participant. From time to time she confronted groups of officers and shouted obscenities at them. Her actions were described as an apparent effort to "get things fired up." At one point she blocked the progress of a fire truck by standing in front of its path. She was seen holding a bottle in her hand. At another time she was seen standing alongside a car which had been set on fire.

As the riot progressed it became more violent, disorderly and widespread. Police cars were wrecked, automobiles were burned, and rocks, wrenches, chunks of concrete and bottles were thrown at the police officers, the courthouse, and other buildings. Windows in the courthouse were broken. Pop bottles filled with gasoline were thrown into the courthouse. A flare ignited the gasoline causing the courthouse to catch on fire and be severely damaged. The Custer Chamber of Commerce building located near the courthouse was set on fire and burned to the ground. The demonstrators knocked out the front windows of a nearby Texaco gasoline station and set the building on fire. The Standard Oil bulk station was set on fire and damaged to the extent of $9,000.00.

Although Mrs. Bad Heart Bull was present and an active participant throughout the course of the riot there is no evidence that she personally threw gasoline or set fire to any automobile or building. She was not arrested and taken into custody until after leaving the Custer area.

The record in this case is voluminous, consisting of over thirty volumes together with a large number of exhibits. It is replete with pre-trial, trial, and post-trial motions, hearings, and orders. Many of defendants' motions were granted by the trial court relating to discovery, continuances, severances, the admission of evidence, and a change of venue from Custer County in the western section of the state to Minnehaha County in the eastern part of the state. Defendants do not question the sufficiency of the evidence to sustain their convictions; however, they do assign error to the denial of several motions on constitutional, substantive, and procedural grounds. These will be separately discussed under appropriate group headings.

## I.

## CONSTITUTIONALITY OF RIOT STATUTES

Defendants' primary contention is that the South Dakota riot statutes under which they were indicted, convicted, and sentenced violate the I, V, VIII and XIV Amendments to the United States Constitution and Article VI, Sections 2, 4 and 23 of the South Dakota Constitution. The statutes in question read as follows:

SDCL 22–10–1. "*Riot defined*—Any use of force or violence or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is riot."

SDCL 22–10–3. "*Participant in riot as guilty of felony committed in course of riot*—If any murder, maiming, robbery, rape, or arson was committed in the course of a riot, every person guilty of participating in such riot is punishable in the same manner as a principal in such crime."

■ It should be noted at the outset that in the construction of any criminal statute the common law rule that penal statutes are to be strictly construed has been abrogated by statute in this state. Accordingly, " * * * all penal statutes are to be con-strued according to the fair import of their terms, with a view to effect their objects and promote justice." See SDCL 22–1–1.

### 1. *Criminal Intent.*

In this respect defendants contend the riot-arson statute denies due process of law by allowing a conviction of a major crime without a showing of criminal or culpable intent to commit the felony charged.

■ The crime of riot is an offense against public peace and good order. It cannot be committed by one person in isolation. Mere presence alone does not make one a rioter but any person who encourages, incites, promotes, or actively participates in a riot is guilty as a principal. *People v. Moore*, 87 Cal.2d 753, 197 P.2d 835; *State v. Sellers*, 257 S.C. 35, 183 S.E.2d 889, cert. den. 410 U.S. 908, 93 S.Ct. 967, 35 L.Ed.2d 269. It necessarily is a group crime requiring proof of a common or mutual criminal intent. According to our statute when three or more persons acting together, without authority of law, use or threaten to use force or violence accompanied by the immediate power of execution, all participants are guilty of riot as principals. The state is only obligated to prove the common or mutual intent of the group to commit an unlawful act by force or violence or the threat thereof. This mutual or common intent need not be established by independent positive proof. It may be inferred from all the facts and circumstances surrounding the commission of the offense.

■ Furthermore, every person who participates in a riot acts at his own peril and may be held criminally responsible for the natural and probable consequences of the riot action. When arson, or any other felony recognized by our statute, is committed in the course of a riot, each rioter may be found guilty of the aggravated crime as a principal. Consequently, in the present case the state was not obligated to show that every rioter committed, or intended to commit, arson. To satisfy constitutional due process it was only necessary for the state to prove that one or more of the rioters, in the course of the riot intended to,

and did, set unlawful fires. The evidence clearly shows arson was unlawfully committed in the course of the riot by several of the assembled rioters. It is equally clear that both defendants in this case were active participants in the riot.

### 2. *Cruel and Unusual Punishment.*

Defendants claim that since the state was only required to prove conduct amounting to a misdemeanor, and as defendants may have had little or no ability to influence or prevent conduct by other rioters, the punishment prescribed in SDCL 22–10–3 is unconstitutionally "cruel and unusual" by allowing the imposition of felony penalties for misdemeanor conduct.

■ Generally, the state and federal constitutional provisions barring cruel and unusual punishments refer to the character, such as barbaric penalties involving physical torture, rather than the duration of punishment. See 21 Am.Jur.2d, Criminal Law, Section 612. Although punishment by imprisonment is not per se cruel and unusual it may be constitutionally offensive when the duration of the sentence prescribed is so excessive or disproportionate to the crime committed as to shock "the conscience and reason of men generally." *State v. Becker* (1892) 3 S.D. 29, 40, 51 N.W. 1018, 1022.

The maximum penalty for the aggravated crime of riot where arson is committed is ten years. Sarah Bad Heart Bull received an indeterminate sentence of one to five years which was fixed by the Board of Pardons and Paroles at one year. Robert High Eagle received an indeterminate sentence of five to seven years which was fixed by the Board at five years, and which was later commuted by the Governor to a term of two years. Both sentences are well below the maximum punishment permitted.

■ It is held in *Spies v. U. S.*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, that lesser offenses committed in combination with each other may be designated by the legislature as felonies, and punishment prescribed accordingly. Likewise, our legisla-ture could lawfully enact our aggravated riot statute making every participant in a riot guilty of a felony whenever one of the designated felonies therein is committed in the course of a riot. The need for such a law to protect persons and property and to preserve peace and good order is reflected in the evidence of this case where the rioters defied the law and turned to vicious violence and the destruction of private and public property. Viewing the penalty prescribed according to modern concepts it cannot be considered as cruel or unusual. Certainly, the sentences imposed or prescribed are not so excessive as to shock the general conscience. Conversely, it would shock the public conscience if minor misdemeanor penalties only could be constitutionally imposed as punishment for the aggravated offense involving violent, disruptive, and destructive conduct.

### 3. *Vagueness and Overbreadth.*

Defendants assert at great length that SDCL 22–10–1 and 22–10–3 are so lacking in clarity and are so overbroad in scope they fail to give persons of ordinary intelligence fair warning of what conduct is prohibited; they lend themselves to arbitrary and discriminatory application; they apply to conduct which cannot be constitutionally regulated; and they infringe upon the exercise of First Amendment freedom of speech, association and assembly.

■ A crime must be statutorily defined with definiteness and certainty. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894. A criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 and *State v. Bullis* (1975) S.D., 231 N.W.2d 851.

■ The riot statutes have been part of our penal code since 1877. See South Dako-

ta Penal Code 1877, §§ 476 and 477. Their meaning has never before been challenged. They contain words of common usage and understanding. Dictionary definitions are unnecessary to determine their meaning or their reach. They clearly give fair notice to a person of ordinary intelligence that certain specific conduct is prohibited.

Contrary to defendants' assertions the riot statutes in this state have not been selectively enforced or limited to prosecutions against Indians, or other minority groups. See *State v. Page*, 15 S.D. 613, 91 N.W. 313 and *State v. Comes*, 64 S.D. 537, 268 N.W. 724. In this same vein defendants suggest various situations in which innocent people, particularly the poor or unpopular minority groups, might be selectively prosecuted under such statutes. For example, it is suggested that police officers could provoke a peaceful assembly of an unpopular minority group into a riot and then prosecute and punish all participants. We believe such a possibility to be more fanciful than real. The crime of riot is not so lacking in comprehensible standards that it can be converted into an instrumentality of oppression and persecution. As this court said in *State v. Watson* (1975) S.D., 231 N.W.2d 839, 842, "statutes do not have to satisfy all hypothetical situations as long as they are not violative of the rights of the defendants in this case."

■ The rights of free speech and assembly protected by the First and Fourteenth Amendments to the United States Constitution are not unlimited and absolute in scope. This subject was considered at length in *Cox v. State of Louisiana*, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487, in which the court upheld the validity of a Louisiana statute which prohibited picketing and parading in or near courthouses even though the prohibited conduct was intertwined with the constitutionally protected rights of free speech and free assembly. The court quoted with approval from *Giboney v. Empire Storage & Ice Co.*, 336 U.S. [490] at 502, 69 S.Ct. 684, 93 L.Ed. at [834] 843, that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." The court went on to say:

"Nothing we have said here or in No. 24 [*Cox v. State of Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471,] is to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property, or protect the administration of justice and other essential governmental functions.

Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations." 379 U.S. at 574, 85 S.Ct. at 485, 13 L.Ed.2d at 498.

In *Abernathy v. Conroy*, 429 F.2d 1170, the U.S. Court of Appeals for the Fourth Circuit rejected plaintiff's contention that the South Carolina riot statute offended the First and Fourteenth Amendments because of vagueness and overbreadth by concluding that,

"[I]t is clear that there can be no valid conviction for riot under South Carolina law without violence, and it is axiomatic

that violent acts are not accorded protection under the first amendment, even though they also constitute expressive or communicative conduct. Moreover, it is self-evident that the state has a legitimate interest in protecting the persons and property of its whole citizenry from the violence of a few. No balancing test is necessary. South Carolina may absolutely proscribe violent conduct. It is, therefore, consistent with the overbreadth doctrine for South Carolina to forbid violent activity that is also noisy and frightening. We hold that the South Carolina common law definition of riot is not overbroad and does not infringe upon activities protected by the first and fourteenth amendments." 429 F.2d at 1176.

Likewise, the gravamen of the crime of riot in South Dakota is violence or the immediate threat thereof. As such, it relates to and prohibits certain defined conduct rather than forms of expression. Laws of this nature are needed and necessary to preserve good order and to protect all persons and all property from the violence of a few. They do not violate the constitutional rights of free expression and assembly as those rights end when violence begins.

## II.

### GRAND JURY MINUTES

In a pre-trial motion defendants requested the court to order "The production of all grand jury minutes and proceedings both transcribed and untranscribed, with disclosure of any times when minutes were not taken. In addition, the production of all evidence or exhibits presented to the grand jury." This broad and unlimited discovery demand was properly denied by the trial court.

The secrecy of grand jury proceedings is governed by the following statutory provisions:

"SDCL 23–30–13. *Secrecy of proceedings.*—Every member of the grand jury must keep secret whatever he himself or any other grand juror may have said, or in what manner he or any other grand juror may have voted, on a matter before them."

"SDCL 23–30–14. *Disclosure of matters to attorneys for state—Court direction required for other disclosures—Sealed indictment.*—Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the state for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court. No obligation of secrecy may be imposed upon any person except in accordance with this section. The court may direct that an indictment shall be kept secret until the defendant is in custody or had given bail, and in that event the clerk of courts shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons."

Section 23–30–14 was amended in 1972 to conform to Rule 6(e) of the Federal Rules of Criminal Procedure. In denying petitioner's claim of an absolute right to the grand jury testimony of a trial witness under Federal Rule 6(e) the United States Supreme Court in *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, stated that:

"To make public any part of its [a grand jury's] proceedings would inevitably detract from its efficacy. Grand jurors would not act with that independence required of an accusatory and inquisitorial body. Moreover, not only would the participation of the jurors be curtailed, but testimony would be parsimonious if each witness knew that his testimony would soon be in the hands of the accused. Especially is this true in antitrust proceedings where fear of business reprisal might haunt both the grand juror and the witness. And this 'go slow' sign

would continue as realistically at the time of trial as theretofore.

It does not follow, however, that grand jury minutes should never be made available to the defense. This Court has long held that there are occasions, see *United States v. Procter & Gamble*, supra, 356 U.S. [677] at 683, 78 S.Ct. [983] at page 987 [2 L.Ed.2d 1077], when the trial judge may in the exercise of his discretion order the minutes of a grand jury witness produced for use on his cross-examination at trial. Certainly 'disclosure is wholly proper where the ends of justice require it.' *United States v. Socony-Vacuum Oil Co.*, supra, 310 U.S. [150] at page 234, 60 S.Ct. [811] at page 849 [84 L.Ed. 1129]. The burden, however, is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy. * * * " 360 U.S. at 400, 79 S.Ct. at 1241.

▆▆▆ There is no constitutional or statutory requirement that grand jury testimony be recorded. *United States v. Biondo*, 483 F.2d 635, cert. den. 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563. When recorded, however, disclosure remains committed to the sound discretion of the trial judge upon a showing of a "particularized need where the secrecy of the proceedings is lifted discreetly and limitedly." *Pittsburgh Plate Glass Co. v. United States,* supra.

▆▆▆ In the present case defendants failed to sustain the burden of showing a "particularized need" for the production of all evidence and exhibits presented to the grand jury. Consequently, there was no abuse of judicial discretion in the denial of such motion.

## III.

### VOIR DIRE PROCEDURE

Because the case involved widely publicized and highly controversial issues, events, and people, defendants assert the only way they could be assured of an "impartial jury" guaranteed by Article VI, Section 7 of the South Dakota Constitution, was to allow their examination of each juror individually and out of the presence of other jurors.

The voir dire was conducted in the usual manner of calling and examining prospective jurors in panels of twelve. Each panel was first questioned by the judge as to possible bias because of publicity and as to possible disqualification for statutory reasons. This was followed by extensive examinations of each individual prospective juror by the defense counsel and by the prosecuting attorney. The individual examinations by defense counsel were lengthy, unrestricted, and covered every possible source of bias or prejudice. Several jurors admitted bias and were excused by the court. No claim is made that any particular member of the jury finally seated was biased or disqualified for any reason.

▆▆▆ The unrestricted extensive probing of individual jurors fully complied with every constitutional command and procedural requirement relating to a fair trial. *U. S. v. Crow Dog*, 532 F.2d 1182. There is no "right" or "requirement" that prospective jurors be individually examined out of the presence of other jurors. That is a precautionary procedure which may be permitted, in the discretion of the trial court, in cases surrounded by massive publicity and involving controversial issues. See *Silverthorne v. United States*, 400 F.2d 627; *State v. Pickering*, S.D., 245 N.W.2d 634; *State v. Herrington*, 41 Wis.2d 757, 165 N.W.2d 120; *State v. Elmore*, Iowa, 201 N.W.2d 443; and *State v. Fiegl*, 184 Neb. 704, 177 N.W.2d 643.

## IV.

### DISRUPTION OF TRIAL

▆▆▆ On April 30, 1974, the trial of defendants in Minnehaha County was disrupted when the courtroom spectators refused to obey an order of the trial judge. The denial of defendants' motion for dismissal or postponement of their trial following this incident was assigned as error. This incident occurred during the voir dire examination, and the motion was made because of

the nature of the incident and the publicity surrounding it. This issue was not developed in the brief or in oral argument as to any prejudice to defendants resulting from proceeding with the trial. The record indicates that following the April 30th incident the court permitted extensive individual inquiry of the prospective jurors who heard or otherwise learned of the incident. Several were excused because they felt that they could not be fair to the defendants. The defense was given every opportunity to probe for possible bias. Only one of the twelve jurors who was in close proximity to the courtroom scene during the incident ultimately served on the jury. No individual challenge for cause was made as to this juror, and no preemptory challenge was made of this juror. Due to this extensive inquiry, the trial court did not abuse its discretion in proceeding with the trial.

## V.

### CROSS–EXAMINATION OF DEFENDANT AS TO PRIOR CONVICTIONS

Defendants claim error in permitting cross-examination of High Eagle as to his previous misdemeanor convictions of DWI. On direct examination he was asked whether he had "somewhere in the past * * * gotten in trouble with the law." Thereupon he testified concerning three felony convictions. The state contends this opened the door for its question about "other trouble with the law," including misdemeanors. Generally where prior misdemeanor convictions are allowed to be the subject of a cross-examination inquiry, a defendant must have placed his good character in evidence. We do not feel that defendant High Eagle did so in this case, and therefore it was error to allow the state to introduce evidence of his bad character. The questions on direct concerning "trouble with the law" were not asked to show defendant's good character in that he had only been convicted of three felonies. The undoubted purpose of this questioning was to introduce the damaging evidence before the state sought to do so on cross-examination. However, in view of the serious felony convictions of forgery and grand larceny which defendant had already admitted before the jury, we cannot find reversible error in presenting evidence of DWI convictions.

We have carefully considered defendants' other assigned errors and finding no abuse of discretion in their denial, or merit therein, the judgments appealed from are affirmed.

All the Justices concur.

HANSON, Retired Justice, sitting for ZASTROW, J., disqualified.