STATE of South Dakota, Plaintiff
and Appellee,

v.

John S. "Jack" O'CONNOR,
Defendant and Appellant.

No. 14204.

Supreme Court of South Dakota.

Argued April 16, 1984.

Decided Nov. 27, 1985.

Rehearing Denied Jan. 2, 1986.

Marten A. Trotzig, Acting Minnehaha Co. State's Atty., Sioux Falls, and Steve Miller, Sp. Deputy State's Atty., Sioux Falls, and Mark V. Meierhenry, Atty. Gen., Pierre, on brief), for plaintiff and appellee.

Thomas J. Nicholson of McFarland, Petersen & Nicholson, Sioux Falls, for defendant and appellant.

YOUNG, Circuit Judge.

On September 23, 1982, appellant John J. "Jack" O'Connor (O'Connor) was indicted for grand theft, conspiracy to commit burglary, and conspiracy to commit grand theft in connection with a January 3, 1982, food stamp theft at the Minnehaha County Food Stamp Office. After a jury trial and conviction, O'Connor appealed. We affirm the convictions and remand for resentencing.

Between January 15 and January 18, 1982, the Minnehaha County state's attorney applied to the trial court for an order authorizing the interception of the oral wire communications of O'Connor, Murray James Severns (Severns), and Carol Monson (Monson) of Minnehaha County. The supporting affidavit of Sergeant Edmond of the Sioux Falls police department was one of the attachments to the application. After finding probable cause, the trial court issued an intercept order for conversations of Severns and Monson over the telephone listed at O'Connor's and Severns' residence. The order authorized wire communications interception from January 18, 1982, through January 30, 1982, and interception of oral communication from January 29, 1982, through February 1, 1982.

During the oral and wire interception, the state's attorney applied for three pertinent amendatory orders. On January 21, the trial court issued an amendment to the original intercept order authorizing interception at O'Connor's and Severns' new address; the previously authorized interception at the initial address was discontinued. On January 23, 1982, the trial court added Loris Kohler as one whose wire and oral communication could be intercepted and changed the time that the master tapes were to be submitted for sealing. Finally, on January 27, 1982, the trial court clarified and refined the oral interception authority of the intercept order based upon the state's attorney's oral application.

Judge Hurd retained all of the original and copied documents in his possession in sealed envelopes until January 23, 1982. From then until December 10, 1982, the wire tap documents were kept sealed in an unlocked cabinet in his chambers. Judge Hurd did not, however, file an inventory. On two to four occasions these documents were revealed to a state's attorney to verify that they were the same as the document copies in the state's possession.

In February 1982, several original documents were stolen from the state's attorney's car. As a result, those original documents were never sealed. Further, the remaining photocopies of the original intercept order did not contain Judge Hurd's signature. Whenever Judge Hurd did not retain originals, however, he retained doc-

ument copies which were true and correct duplications of the originals.

One of the key witnesses instrumental in O'Connor's indictment was Severns, who was in Sioux Falls during the food stamp burglary. In July 1982, he was arrested in California. While in jail, Severns was interviewed by Captain Don Skadsen from the Sioux Falls police department. Skadsen told Severns that he faced two ten year sentences for his involvement with the burglary. Skadsen told Severns that the police department had recorded conversations and wire intercepts from several Sioux Falls residences. Skadsen proceeded to outline a plea agreement. He told Severns that the state's attorney had authorized him to offer a deal of two and one-half years actual time served. In exchange, Severns had to assist the police department in recovering the remaining food stamps and provide information and witnesses which would allow the arrest of others involved in the food stamp burglary, transfer, and sale. Skadsen emphasized that unless Severns upheld these conditions, no deal existed.

Severns was extradited to Sioux Falls. He signed the formal plea bargain on September 9, 1982. Severns not only testified before the grand jury, but he produced his sister-in-law from Wisconsin who, after knowing nothing about the burglary in a prior grand jury hearing, had information which lead to O'Connor's indictment on September 23, 1982.

Prior to his trial, O'Connor requested, but did not receive, all of the state's witnesses' statements as well as grand jury testimony. Three days prior to trial, however, the state was ordered to present O'Connor with extensive discovery.

The trial commenced on February 22, 1983. During the trial, the state questioned Richard Cole and Mike Catrono about the price of food stamps and the disposal of those stamps. Severns testified that Cole, Young, and Harvey were involved in phone calls concerning food stamps. Young, Harvey, and Catrono's names were not provided in any discovery

to the defense. O'Connor requested a recess to locate these individuals, but the trial court refused the request.

Further, the trial court allowed the state to utilize seven prior convictions to impeach O'Connor's credibility. The seven offenses included: obtaining money by false pretenses, 1962, 1965, and 1969; burglary, 1969 and 1970; first degree robbery, 1971; and conspiracy, 1975. The 1969 and 1970 burglary convictions, however, had been set aside in 1975.

On March 8, 1983, the jury returned a verdict. Judge Hurd, a state's witness during the trial, received the verdict because Judge Heege was out of town. O'Connor was convicted on all three counts and received life sentences without parole.

O'Connor raises twenty-nine issues on appeal. This opinion consolidates these issues into six areas: (1) the plea agreement; (2) legality of the wire and oral communication interception; (3) non-evidentiary trial issues; (4) trial issues; (5) Judge Hurd's involvement as state's witness; and (6) sentencing.

## THE PLEA AGREEMENT

Severns, the state's key witness, was offered and accepted a contingent plea agreement. Captain Skadsen explained:

I told Severns that the State's Attorney, Jack Hanson, had authorized me to offer him a deal of two and one-half (2 ½) years of actual time served and that it would not necessarily have to be served in South Dakota. However, in order for him to get this type of agreement, we had to recover the remaining $100,000–$150,000 in food stamps still not accounted for, and information and witnesses that would allow us to arrest the other subjects involved in the burglary and the transfer and sale of the stamps. Again, Severns was told that unless we recovered the stamps and unless we obtained information leading to the arrest of the people involved, that we would make no deal.

Contingent plea agreements have been criticized as a violation of the Fifth Amendment due process clause because they are fundamentally unfair, they encourage perjured testimony which can not be rectified by cross-examination, and they undermine the judicial system's integrity. *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984). The Eighth Circuit initially reversed the district court decision in *Waterman* and found the contingent plea agreement to be in violation of the defendant's due process rights as protected by the Fifth Amendment. Later, the Eighth Circuit sitting en banc vacated its earlier decision. An evenly divided court affirmed the district court judgment permitting the testimony based on this contingent plea agreement. *United States v. Waterman, supra.*

The plea agreement in *Waterman, supra,* stated that if a co-conspirator's cooperation and truthful testimony led to further indictments the government would affirmatively recommend a reduced sentence. If the testimony did not lead to further indictments, the government would not recommend any reduction. The issue was whether the agreement to procure this testimony placed a premium on testimony adverse to a defendant, thereby creating a risk of perjury so great that even with the jury's full knowledge of the agreement, it would be insufficient to protect fundamental fairness inherent in the due process clause. The Eighth Circuit Court of Appeals held that if the contingent plea agreement hinged upon successful convictions instead of further indictments, it would be contrary to the due process clause. Furthermore, the First Circuit Court of Appeals in *United States v. Dailey*, 759 F.2d 192 (1st Cir.1985), upheld the use of a contingent plea agreement on the basis that the agreement was fully disclosed to the jury, there was complete cross-examination, and the proper cautionary instruction was given concerning the accomplice's testimony.

■ Contingent plea agreements should be reserved for the very exceptional cases. They cannot be contingent upon the return of an indictment or a guilty verdict. In the rare exceptional cases where the value and the extent of the accomplice's knowledge is uncertain, but likely to be very great, and there is full disclosure to the jury, a constitutional violation does not occur. *Dailey, supra.* (*See State v. Waff*, 373 N.W.2d 18 (S.D.1985), upholding a plea agreement contingent upon the co-conspirator's promise to cooperate by testifying truthfully.) In this case, the O'Connor plea agreement involved truthful testimony of a co-conspirator and other witnesses leading to the arrest. Although we do not approve of these types of contingent plea agreements, in this case it is not a violation of due process rights under the Fifth Amendment. The jury was fully aware of the plea agreement and O'Connor had a full and complete opportunity to cross-examine the benefactor of that agreement.

## LEGALITY OF THE WIRE AND ORAL COMMUNICATION INTERCEPTION

### *Constitutionality of SDCL Chapter 23A–35A*

O'Connor contends that his conviction should be reversed because evidence was secured with a court authorized wire tap pursuant to an unconstitutional state statute. Specifically, he contends that the state statute is invalid because it is less restrictive than federal law. 18 U.S.C. 2510. He argues that the South Dakota provisions are less restrictive in three areas:

1. Under federal law, the wire tap documents must be maintained for 10 years and no such South Dakota provision exists;

2. Under federal law, the defendant must receive copies of the wire tap documents ten days prior to trial and no such South Dakota provision exists;

3. Under federal law, an exclusionary rule exists, but no such rule exists under South Dakota law.

O'Connor argues that *State v. Farha*, 218 Kan. 394, 544 P.2d 341 (1975); and *State v. Dowdy*, 222 Kan. 118, 563 P.2d 425 (1977), control this issue. We do not agree

with the reasoning or holding of the Kansas courts. Instead, we adopt the reasoning and holding of the courts of Maryland and Arizona. *State v. Siegel,* 266 Md. 256, 292 A.2d 86 (1972); *State v. Politte,* 136 Ariz. 117, 664 P.2d 661 (1982). *Siegel and Politte* both held their statutes constitutional. *Siegel* held,

> [W]hether each of their terms [federal v. state provisions] relating to the application or grant of an order is constitutional, *vel non* is of no consequence. Once the hurdle of finding an applicable Maryland law authorizing interception is overcome, compliance must be had with whichever law is more constricting, be it federal or state.

292 A.2d at 95.

■ SDCL 23A–35A authorizes oral and wire communication interception. As a result, compliance must be had with whichever law is more constricting, be it federal or state. In effect, O'Connor is arguing that the South Dakota provisions do not provide for a number of federal requirements. What he fails to ascertain is that even if the South Dakota statute is silent concerning those requirements, the reviewing court must look to determine if the state complied with the federal statute. Here the federal requirements were followed. The wire tap documents have not been destroyed thus allowing the maintenance of the documents for ten years pursuant to federal statute; O'Connor received the wire tap documents more than ten days prior to trial according to federal statute; and the federal exclusionary rule was applied in these proceedings. Therefore, we reject O'Connor's arguments that South Dakota Chapter 23A–35A is unconstitutional.

### Probable Cause

SDCL 23A–35A–6 and 18 U.S.C. 2518 state that probable cause must exist before an order for interception of oral and wire communication may be issued. In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court rejected the two-pronged probable cause test established by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), to determine whether an informant's tip establishes probable cause for the issuance of a warrant. The Supreme Court stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed. [citations omitted] We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli.*

462 U.S. at 238–239, 103 S.Ct. at 2232, 76 L.Ed.2d at 548.

O'Connor argues that the state's attorney's application for the order authorizing interception of oral and wire communication is conclusory, is supported with sporadic, unexplained factual allegations, and does not supply sufficient probable cause to warrant the intercept order.

■ We are convinced that the attached affidavit disclosed facts from which the issuing judge had a substantial basis for concluding probable cause existed to issue the order authorizing interception. Those facts are:

1. Prior to the burglary Carol Monson gave the food stamp office key to Severns;

2. Severns had not received the cash yet and he did not want to know the location of the stamps;

3. After the theft, Severns told Monson that he expected to profit;

4. After the theft, Severns called Monson and told her that "have the stamps";

5. Severns and O'Connor lived together and were involved together in prior criminal activity; and

6. Severns and O'Connor made several calls to Sioux City, Iowa.

Therefore, the *Illinois v. Gates, supra,* test was satisfied and the issuance of the order authorizing interception was warranted.

### Post-Intercept Problems

O'Connor argues that all wire tap evidence should be suppressed due to six violations of SDCL 23A–35A–12. He contends that the original intercept order and several other wire tap documents were lost or stolen from the state due to the state's attorney's negligence. In addition, the remaining photocopies of the original intercept order have no signature on them, the documents were not properly sealed, the verification of documents occurred three days after their execution, and the issuing judge never kept an inventory of the document file.

■ The Supreme Court has stated on several occasions that not every failure to comply with federal wire tap law will result in suppression of wire tap tapes. Only a failure to satisfy a requirement that directly and substantially promotes a congressional intent will result in suppression. *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Further, technical noncompliance necessitates suppression only if the violative procedure is a denial of a functional safeguard in the statutory scheme to prevent abuses of the act and if the purpose of the procedure has been frustrated or the procedures deliberately ignored. *See United States v. Diana,* 605 F.2d 1307 (4th Cir.1979).

■ Although each of the six items of noncompliance demonstrates a denial of a functional safeguard in the statutory scheme to prevent abuse of the act, reversible error was not committed because the judge retained certified copies of all of the lost or stolen documents. The trial court also found that no one had tampered with the certified copies. Because of these facts, O'Connor was not prejudiced by the gross negligence of the state's attorney in violating the functional safeguards of the act since there was no finding that these safeguards were deliberately ignored nor the purpose of the act thwarted by the state's attorney.

### NON-EVIDENTIARY TRIAL ISSUES

O'Connor contends that he requested statements of all prosecution witnesses and grand jury testimony prior to trial. The trial court ordered the prosecution to turn over these statements to the defense on the Friday preceding trial. As a result, O'Connor argues that he had inadequate time to prepare for the trial. O'Connor also contends that he was refused a continuance during the trial. Specifically, he argues that Richard Cole was called by the state as a prosecution witness. During the trial, Cole was questioned concerning Mike Catrono, the price of food stamps, and disposal of those stamps. Further, Severns testified that Cole, Young, and Harvey were involved in phone calls concerning food stamps. Young, Harvey, and Catrono's names, however, did not appear in the discovery that the state supplied O'Connor.

■ SDCL 23A–13–6 and 7 provide that statements in the possession of the prosecuting attorney, which were made by a prosecution witness or by a prospective prosecution witness, are not subject to subpoena, discovery, or inspection, until such witness has testified in direct examination, in the preliminary hearing or in the trial of the case. The state argues that under this statute it does not have to turn over prospective witnesses' statements until direct examination at the trial if the indicted de-

fendant does not have a preliminary hearing.

The state's position is clearly untenable. Grand jury proceedings are secret. If the prosecution will not supply the defense with a copy of the transcript, the defense will find it impossible to confront and cross-examine the state's witnesses, a clear Fifth Amendment violation. Further, the state interprets SDCL 23A–13–6 too narrowly. The effect of a preliminary hearing and a grand jury is synonymous; each proceeding has the capacity to bind an individual over for trial. The release of a witness' statement should not be treated any differently when an indictment is involved. As a result, the state should have released the prospective witnesses' statements upon request after the indictment.

■ Finally, the defense is entitled to a continuance during the course of the trial to prepare for cross-examination after a witness has testified if the defense was not supplied with new names and information during discovery. If the prosecution espouses an attitude of not releasing grand jury testimony promptly and not releasing witnesses' statements after an indictment, the rules of deposition should be liberally construed in favor of the defense.

■ Because O'Connor was able to confront these witnesses at trial and to adequately cross-examine them, no reversible error resulted. This court, however, does not condone the practice employed by the state's attorney's office in failing to release names and information to the defense at a point in time earlier than it did.

## TRIAL ISSUES

### Prior Convictions

■ At trial, the prosecution was allowed to utilize O'Connor's seven prior convictions to impeach his credibility. O'Connor argues that the trial judge improperly admitted the seven prior convictions.

SDCL 19–14–14(2) states, "[e]vidence of a conviction is not admissible ... [if] the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence." As a result, the 1969 and 1970 burglary convictions which had been set aside in 1975 were inadmissible as impeachment. The trial judge did minimize the impact of these convictions, however, by not allowing testimony concerning the details or naming the specific crimes. In addition, there is no plain error because there were five valid convictions. *State v. Bad Heart Bull,* 257 N.W.2d 715 (S.D.1977).

### Hearsay

■ During the trial, Wanda Severns, Carol Monson, and Margaret McCutcheon testified for the state. Wanda Severns and Monson testified that they heard O'Connor make statements concerning the theft; they related those statements to the jury. O'Connor argues that the testimony is inadmissible hearsay because it does not satisfy SDCL 19–16–3(5) which states, "A statement is not hearsay if it is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." O'Connor's argument is misguided. SDCL 19–16–3(1) states, "A statement is not hearsay if it is offered against a party and is his own statement, in either his individual or a representative capacity[.] ..." Because Severns and Monson related statements that O'Connor made, those statements are clearly admissible.

■ McCutcheon's testimony concerning statements which Carol Monson, a co-conspirator, related to her, however, is inadmissible as double hearsay. McCutcheon testified that Monson conversed with her during mid-December about the upcoming food stamp burglary. Despite the inadmissibility of this testimony under the double hearsay rule, the McCutcheon testimony is merely cumulative because Monson testified to this same conversation. As a result, the error is harmless. *State v. White Mountain,* 332 N.W.2d 726 (S.D.1983); *State v. Tribitt,* 327 N.W.2d 132 (S.D.1982).

## Instructions

■ O'Connor set forth eleven issues concerning the jury instructions. Initially, we note that a failure to object to an instruction at trial will not preserve the error for appeal. SDCL 15–6–51(b); *State v. West*, 344 N.W.2d 502 (S.D.1984); *State v. White Mountain, supra.* Therefore, O'Connor's objection to instructions 21 and 28 are not before us on appeal.

Further, jury instructions are to be considered as a whole. If the instructions correctly state the law and inform the jury, they are sufficient. *State v. West, supra; State v. Fox*, 313 N.W.2d 38 (S.D.1981); *State v. Howard*, 323 N.W.2d 872 (S.D. 1982). Instructions 7, 14, 15, 16, and 28 are not artfully worded or arranged. When read together with the other instructions, however, they are clear. Taken as a whole, the instructions sufficiently inform the jury of the law.

■ Instructions 17, 18, and 19 instructed the jury on accomplices. O'Connor argues that the instructions did not name which individuals were accomplices as a matter of law and which individuals the jury needed to determine were accomplices. At trial, defense counsel objected to these instructions but failed to propose a jury instruction. In order to preserve point on appeal, counsel must propose the instruction. *State v. Nelson*, 272 N.W.2d 817 (S.D.1978). As a result, no reversible error resulted in any of the instructions.

## JUDGE HURD AS A WITNESS

■ On March 8, 1983, Judge Hurd took the jury verdict. Prior to this, Judge Hurd testified as a state's witness in the jury trial and motion hearings. O'Connor argues that Judge Hurd was not qualified to receive the verdict. Trial judges should be discouraged from being both a witness and receiving the verdict in the same trial. Here, no reversible error exists because O'Connor failed to poll the jury, make motions, or challenge any legal matters at the time the verdict was received.

## SENTENCING

O'Connor was convicted of all three counts, each representing property crimes. He received two life sentences without parole. Since that sentencing, the United States Supreme Court has examined life sentence without parole under the recidivist statute. *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); *see also, State v. Weiker*, 366 N.W.2d 823 (S.D. 1985). As a result, this case is remanded for resentencing to allow the sentencing judge to apply the appropriate proportionality criteria.

We have reviewed O'Connor's remaining arguments and find them to be without merit. We affirm the convictions and remand for resentencing.

FOSHEIM, C. J., and MORGAN, J., concur in result.

HENDERSON, J., dissents.

YOUNG, Circuit Judge, sitting by appointment.

WUEST and HERTZ, Circuit Judges, acting as Supreme Court Justices, not participating.

FOSHEIM, Chief Justice (concurring in result).

I agree that no reversible error resulted from the timing of the release of requested statements to defendant. However, I reach that result under the rationale that the trial court ordered release of the statements in substantial compliance with the appropriate governing statutes.

Prior to trial O'Connor requested the court for access to the grand jury testimony and statements from prosecution witnesses. Initially, the motions were not acted upon. Later, O'Connor renewed his motions and a hearing was held. Shortly, before trial, the court ordered that O'Connor receive both the grand jury testimony and witness statements. The state promptly complied with the order. O'Connor's request for a continuance was denied.

The plurality opinion concludes without supporting authority that "[i]f the prosecu-

tion will not supply the defense with a copy of the [grand jury] transcript, the defense will find it impossible to confront and cross-examine the state's witnesses, a clear Fifth Amendment violation." It is important to first note that this is not a failure to produce issue. *See generally State v. Sahlie,* 90 S.D. 682, 245 N.W.2d 476 (1976). O'Connor was given access to the grand jury testimony exactly as ordered. His complaint centers on the timing of that access.

The Fifth Amendment does not ipso facto require disclosure of grand jury testimony to a defendant. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). Under South Dakota law, grand jury testimony may be disclosed "only when directed by the circuit court preliminary to or in connection with a judicial proceeding or when permitted by the circuit court at the request of a defendant upon a showing that grounds may exist for a motion to dismiss an indictment...." SDCL 23A-5-16. This court interpreted the predecessor of this statute, SDCL 23-30-14 (providing disclosure "only when so directed by the court"), to allow the trial court, in its discretion, to allow disclosure of recorded grand jury testimony to the defense upon a showing of a "particularized need where the secrecy of the proceedings is lifted discreetly and limitedly." *State v. Bad Heart Bull,* 257 N.W.2d 715, 723 (S.D.1977) (following quote in *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323 (1959)).

Additionally, SDCL 23A-13-6, -7, and -10 deal with discovery of grand jury *and* prosecution witness statements. These sections are patterned after 18 U.S.C. § 3500, which was adopted in response to *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and amended following *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

Under SDCL 23A-13-6 no statements made by prosecution witnesses are discoverable until the witness has testified on direct examination in the preliminary hearing or in the trial of the case. After the witness has so testified and upon motion by the defendant, the trial court shall order the prosecution to produce statements relating to the subject matter as to which the witness testified. SDCL 23A-13-7. A discoverable statement includes "[a] statement, however taken or recorded, or a transcription thereof, if any, made by such witness to a grand jury." SDCL 23A-13-10(3).

In this case, there was no preliminary hearing. The plurality opinion wrongly concludes that because a preliminary hearing and a grand jury indictment both serve to bind the defendant over for trial, SDCL 23A-13-6 must be read to warrant disclosure of grand jury testimony and prosecution witnesses' statements upon request by the defense after indictment. Absent a preliminary hearing, grand jury testimony and witness statements is permitted *only* after direct examination in the trial of the case. SDCL 23A-13-6. Under the federal procedure "motions to disclose transcripts of the testimony of a grand jury witness who does not testify at trial, and *pretrial* motions to discover grand jury testimony of a scheduled trial witness are not covered by the Jenck's Act. Under those circumstances, disclosure can only be made pursuant to the 'judicial proceedings' provision of Rule 6(e) [substantially SDCL 23A-5-16] ... for which the defendant must demonstrate particularized need." 8 Robert M. Cipes, Moore's Federal Practice ¶ 6.05[3] (2d ed. 1981) (emphasis original).

The plurality opinion seems to condemn any exercise within SDCL 23A-13-6 as a Fifth Amendment violation even though the statute springs from the federal rule carrying federal court sanction. Criticism of the state on this issue accordingly seems unwarranted. While the prosecutor may disclose grand jury evidence, *see* SDCL 23A-5-17, both SDCL 23A-5-16 and SDCL 23A-13-6, and -7 contemplate no disclosure until the trial court so orders. Here, the state promptly produced when so directed by the trial court.

I am hereby authorized to state that Justice MORGAN joins in this concurring in result.

HENDERSON, Justice (dissenting).

I respectfully dissent. The jury's verdict was not presented to nor received by the trial court. Thus, the entire proceedings were coram non judice and the judgment of conviction is null and void.

South Dakota Constitution Article VI, § 6, and the Sixth Amendment to the United States Constitution guaranties to the criminally accused, the right of trial by jury. A jury trial is a trial of an issue of fact by a duly impaneled jury, under the direction and superintendence of the court. This direction and superintendence of the court is an essential part of the trial and a trial by jury in the courts of this nation is a trial presided over by a judge. *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–18, 19 S.Ct. 580, 586, 43 L.Ed.2d 873, 877–79 (1899). *See also*, 3 L. Orfield, *Criminal Procedure Under the Federal Rules*, § 23:22 (1966). A court is defined as "an incorporeal political being, which requires for its existence *the presence of its judges, or a competent number of them* ... and the performance of some public act indicative of the design to perform the functions of a court." *In re Terrill*, 52 Kan. 29, 31, 34 P. 457, 458 (1893) (emphasis supplied; citation omitted). There can be no court without a judge, *see Stokes v. State*, 71 Ark. 112, 114, 71 S.W. 248, 249 (1902); *People v. Blackman*, 127 Cal. 248, 249, 59 P. 573, 573 (1899); *State v. Sullivan*, 95 Fla. 191, 208, 116 So. 255, 262 (1928); *State v. Carnagy*, 106 Iowa 483, 487, 76 N.W. 805, 806 (1898); *Slaughter v. United States*, 5 Ind.T. 234, 237, 82 S.W. 732, 733 (1904); *State v. Darrow*, 56 N.D. 334, 340, 217 N.W. 519, 522 (1928); *In re Patzwald*, 5 Okl. 789, 799, 50 P. 139, 143 (1897); *State v. Olberman*, 33 Or. 556, 557, 55 P. 866, 866 (1899); and if the presiding judge abandons the trial or relinquishes control of the proceedings, the criminally accused, who is entitled to be tried in a court duly constituted, has good cause to complain. *State v. Beuerman*, 59 Kan. 586, 591, 53 P. 874, 875 (1898). Thus, "the judge is an essential constituent of a court, and ... there can be no court in the absence of the judge or judges." *State v. Jackson*, 21 S.D. 494, 497, 113 N.W. 880, 881 (1907).

In the present case, the jury returned a verdict on March 8, 1983. Judge Heege, however, the presiding judge, was out of town and R.D. Hurd, *a State's witness during the trial*, received the jury's verdict. It is axiomatic that a witness in a trial cannot be the judge in the trial. SDCL 19–14–5 provides: "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Thus, R.D. Hurd, a witness, who is a circuit judge of the same circuit this case was tried in, could not become the judge in the case and accept the jury's verdict because he was disqualified in all respects from so doing. In *State v. Finder*, 12 S.D. 423, 81 N.W. 959 (1900), this Court reversed a judgment of conviction because a judge previously disqualified by an affidavit of prejudice, received the jury's verdict. In so reversing, this Court held that the disqualified judge was entirely without jurisdiction to receive the verdict. In *State v. Jackson*, 113 N.W. 880, this Court reversed a judgment of conviction declaring it null and void because the clerk of the court accepted the jury's verdict in place of the trial judge. In so reversing, this Court noted that judicial powers and duties are strictly personal in nature, to be performed by the judge alone, and that the "reception of a verdict is clearly a judicial act, and authority to receive it cannot be delegated." 21 S.D. at 498, 113 N.W. at 881. *See also*, *McClure v. State*, 77 Ind. 287, 289 (1881); *Britton v. Fox*, 39 Ind. 369, 371 (1872); *People v. Little*, 305 Mich. 482, 483, 9 N.W.2d 683, 684 (1943); *State v. Bazemore*, 193 N.C. 336, 337, 137 S.E. 172, 173 (1927); and *Allen v. State*, 13 Okl.Crim. 533, 535, 165 P. 745, 746 (1917). In the case at bar, R.D. Hurd, being unable to sit as the judge of the case, was in no better position than the disqualified judge in *Finder* or the layman

in *Jackson,* and thus he could not receive the jury's verdict nor be delegated the authority to do the same. So far as this case is concerned, R.D. Hurd was a witness and a witness only. He was not the judge in the case and could not be the judge in the case.

Although SDCL 23A–25–12 permits a court to adjourn during jury deliberations and nevertheless be deemed opened for every purpose connected with the case submitted to the jury, this statute does not authorize the acceptance of jury verdicts by laymen or disqualified judges. Under SDCL 23A–26–1, the verdict must "be returned by the jury *to the judge* or magistrate in open court." (Emphasis supplied.) A disqualified judge is not the judge of the case and cannot accept the jury's verdict nor be delegated the authority to do the same.

Because the occurrences herein transgress the constitutional right to be tried in a court duly constituted, transgress SDCL 23A–26–1 and transgress our long-standing rulings in *Finder* and *Jackson,* I would reverse the judgment of conviction as null and void and remand for a retrial. The receipt and acceptance of a jury verdict by a trial judge is not a mere ministerial matter, for at this point in a properly constituted trial, numerous judicial decisions and considerations are made. This is especially true in criminal proceedings when the accused's life, liberty and property are at stake. Our courts are instituted for the protection of the people's rights and for the redress of their wrongs. Litigants are entitled to have their actions heard by a properly constituted court in the manner prescribed by law. With the trial judge absent during a vital portion of the proceeding, this is not possible. The trial judge's absence at the rendition of a jury verdict is not a properly constituted trial and it fails to protect personal rights, and the public's interests. This single issue is dispositive of this case and no other contention need be considered. I therefore would reverse.